JAMES H. GOODSELL, Appellant and Respondent, *v.* THE
WESTERN UNION TELEGRAPH COMPANY, Appellant and
Respondent.

The A. & P. Telegraph Co. organized a department for the purpose of sup-
plying newspapers with news transmitted by its wires; this department
was entitled "The National Associated Press, James H. Goodsell, Presi-
dent." Subsequently, said Goodsell, the plaintiff herein, entered into a
contract with said company, he contracting, in the name so given to
the department, to furnish news to be transmitted by it at prices named.
Thereafter, said company assigned and transferred to defendant all
of its property, business, rights and privileges, etc., the latter under-
taking and assuming performance of the contract in question. *Held,*
that plaintiff could maintain an action in his own name for a breach of
the contract; that as the contracting company was not defrauded or mis-
led by the use of the name adopted by plaintiff, neither it nor its assignee
could avoid the contract because of such use.

By the contract, plaintiff was to pay a certain sum per month, the tele-
graph company to transmit a certain number of words daily; for any
excess plaintiff was to pay a rate specified for each word. The contract
provided for the transmission of news over five circuits, one named the
"far western." Subsequently an arrangement was made under which
plaintiff paid for two operators at Pittsburg to repeat dispatches to
towns included in the far western circuit. The amount paid for the two
operators was more than the charges under the contract for excess of
words. *Held,* a finding was proper that this arrangement took the place
of the far western circuit, and that consequently defendant was not enti-
tled to charge for the excess of words sent over that circuit.

The contract provided that of the specified number of words for the regu-
lar reports, one-third should be sent in the day-time and two-thirds at
night; that if the telegraph company should transmit news reports to
any greater number of places than thirty-eight, which were enumerated,
it should receive for the excess over and above the monthly payment, a
certain rate per word, and in case any one of the places named should
cease to take the news service, and if no other place was substituted, the
company would make a rebate from the monthly payments. All of the
places named did not take the reports, and only fifteen or sixteen took
them day and night. The reports were sent to other places not named,
but at no time were there thirty-eight which received the day reports or
the night reports. *Held,* that plaintiff was entitled to have both the
day and night reports transmitted to thirty-eight places for the regular
monthly charge, and it was not requisite that they should be sent to
the same places, but that the night reports might be sent to different
places from those receiving the day reports.

Statement of case.

In March, 1882, defendant's president wrote to plaintiff that it would no longer transmit the news reports at the contract prices, but would from that date charge an increased rate as stated, and unless this was paid that the service would be discontinued. Plaintiff declined to pay the increased rate, and insisted upon the performance of the contract. In reply, said president stated that his company repudiated the contract; he gave plaintiff time to communicate with his customers; being unable to make any arrangements with them to pay the increased price, he so notified defendant on June 20, 1882, stating that he did not waive his claims under the contract, but was willing to carry it out, and demanded performance by defendant. On June 24, plaintiff stopped delivery of his reports. *Held,* that plaintiff was entitled to recover damages for breach of the contract on defendant's part; that, as it had unqualifiedly repudiated the contract, only giving plaintiff time to communicate with his customers, when he failed to make new terms with them and so notified defendant, the extension of time was at an end, the contract was to be considered as abandoned by defendant, and plaintiff was justified in so treating it by stopping his reports.

Reported below, 26 J. & S. 26.

(Argued December 14, 1891; decided January 20, 1892.)

Cross-appeals from judgment of the General Term of the Superior Court of the city of New York, entered upon an order made March 5, 1890, which affirmed a judgment in favor of plaintiff entered upon the report of a referee.

The nature of the action and the facts, so far as material, are stated in the opinion.

*Rush Taggart* for appellant. There was no breach of a contract made with plaintiff individually. (*Berkely* v. *Hardy*, 5 B. & C. 355.) The referee and the court below erred in finding that the evidence established a total breach of the contract under the second cause of action. (*Wakeman* v. *W. & W. M. Co.*, 101 N. Y. 210; *Taylor* v. *Bradley*, 39 id. 120; *Fish* v. *Foley*, 7 Hill, 54; *Johnstone* v. *Milling*, L. R. [16 Q. B. Div.] 460; *M. S. & I. Co.* v. *Naylor*, 9 id. 646; *Zuch* v. *McClure*, 98 Penn. St. 541; *L. Ins. Co.* v. *McAden*, 109 id. 399; *Smith* v. *Lewis*, 24 Conn. 624; *Haines* v. *Tucker*, 50 N. H. 307; *Nelson* v. *Morse*, 52 Wis. 240; 2 Pars. on Cont. 809; *Ehrensberger* v. *Anderson*, 3 Exch. 147; Anson

on Cont. 283; *People* v. *E. M. L. Ins. Co.*, 92 N. Y. 105; *Higgins* v. *D., L. & W. R. R. Co.*, 61 id. 553; *Noyes* v. *Philips*, 61 id. 412; *Sanges* v. *Wood*, 9 Johns. Cas. 416; *Littlefield* v. *Brown*, 1 Wend. 398; 11 id. 467, 470; *Bowen* v. *Mandeville*, 95 N. Y. 240; *Wilkinson* v. *Varity*, L. R. [6 C. P.] 206; *Reid* v. *Hoskins*, 6 E. & B. 953; Bishop on Cont. §§ 827, 829; *M. I. & S. Co.* v. *N. B. & Co.*, L. R. [9 Q. B. Div.] 648; *Simpson* v. *Crippen*, 8 id. 14; *Blackburn* v. *Reilly*, 47 N. J. L. 290.) The action of the plaintiff in abandoning the service of news reports on June 22, 1882, was voluntary and in consequence of a contract made with the United Press Association on June 21, 1882, and not in consequence of any act of the defendant. (Whart. on Neg. § 134; *M., etc., R. Co.* v. *Kellogg*, 94 U. S. 474; *Griffin* v. *Colver*, 16 N. Y. 489; *Masterton* v. *Mayor*, 7 Hill, 61; *Kiley* v. *W. U. T. Co.*, 39 Hun, 158; *Lowery* v. *W. U. T. Co.*, 60 N. Y. 198; *Hall* v. *W. U. T. Co.*, 124 U. S. 444; Bishop on Cont. § 832; *Corney* v. *Newbery*, 24 Ill. 203; *Parmelee* v. *Adolph*, 28 Ohio St. 10; *Henderson* v. *Hicks*, 58 Cal. 364.)

*George W. Miller* for respondent. The contract was valid and plaintiff had an individual interest in it. (26 J. & S. 26; *Com. Bank* v. *French*, 21 Pick. 486; *Mangham* v. *Sharpe*, 17 C. B. [N. S.] 443; *Davis* v. *Garr*, 6 N. Y. 124; *Merritt* v. *Seaman*, 6 id. 168; *De Witt* v. *Walton*, 9 id. 571; Code Civ. Pro. § 3339; *Bryant* v. *Eastman*, 7 Cush. 111; *Bush* v. *Cole*, 28 N. Y. 261; *Minturn* v. *Pain*, 7 id. 224; *Raynor* v. *Grote*, 45 M. & W. 358.) The claim to the effect that the contract is void by reason of section 69 of chapter 1, part 4, title 6, of the Revised Statutes, relating to misdemeanors, is unfounded. (*Gray* v. *Siebald*, 97 N. Y. 472.) The agreement contained in the seventh paragraph of the contract, to keep and render correct accounts and to make monthly settlements, was a material and substantial part of the contract, one without the performance of which by defendant, plaintiff was under no obligation to go on and perform on his part. (*Barruse* v. *Madan*, 2 Johns. 148; *Parmalee* v. *O. & S. R. R. Co.*, 6

N. Y. 80.)   All the acts and neglects and refusals constituted such a decided breach, and were so unequivocal in their terms, as to release plaintiff from any and all further offers of performance on his part, and fully authorize him at any time to treat the contract as broken by defendant and recover damages. (*Crary* v. *Smith*, 2 N. Y. 60 ; *Burtis* v. *Thompson*, 42 id. 246 ; *Selleck* v. *Tallman*, 87 id. 106 ; *Howard* v. *Daly*, 61 id. 362 ; *C. Co.* v. *Gordon*, 6 Wall. 561 ; *Danolds* v. *State*, 89 N. Y. 36 ; *McMaster* v. *State*, 108 id. 542, 552, 553 ; *Cort* v. *A. R. R.*, L. R. [17 Q. B. Div.] 127.)   The proposition that non-payment, refusal to pay, and adjudication of such non-payment, and for the amount so not paid, as agreed, is not evidence of a breach which will justify plaintiff in abandoning the contract and recovering damages, is untenable.  (*Canal Co.* v. *Gordon*, 6 Wall. 561 ; *Graff* v. *Cunningham*, 109 N. Y. 369 ; *McMaster* v. *State*, 108 id. 542.)

HAIGHT, J.   This action was brought to recover an alleged balance due upon a contract, and damages for a breach thereof.

The defense was that the contract was illegal and not made with the plaintiff; that there was nothing due thereon, and that there had been no breach thereof by the defendant.

The agreement was made and entered into on the 21st day of January, 1881, between the Atlantic and Pacific Telegraph Company of the first part, and the National Associated Press, James H. Goodsell, President, party of the second part.   By its provisions the National Associated Press undertook to furnish news to be transmitted by the Atlantic and Pacific Telegraph Company, and the telegraph company undertook to transmit the same to the points named in a schedule attached, and to such other points within the territory situate upon the lines of the company lying west of Portland, Me., and extending as far as Omaha, Neb., and lying north of Richmond, Va., and Nashville, Tenn., and south of Detroit, Mich., and Milwaukee, Wis., but including the places named, for the purpose of supplying the newspapers published within such territory, taking the news reports of the National Associated Press.

The regular service of the National Associated Press to be transmitted by the telegraph company was not to exceed on an average 6,750 words per day, one-third of which was to be transmitted in the day-time and two-thirds thereof in the night-time, between hours specifically designated. The contract further provided : " Fourth. For the transmission and delivery to newspapers and subscribers at all the points or places named in Schedule 'A' hereunto annexed, or to the successors and assigns of such newspapers and of the subscribers of said news reports, the said National Associated Press shall pay the said telegraph company the sum of $5,000 per month, on or before the fifteenth day of each and every month during the continuance of this agreement, which amount of $5,000 per month shall be in full payment for the transmission and delivery of an average of 6,750 words per day as hereinbefore specified. Provided, however, that in case the average of the entire number of words transmitted by said telegraph company in any month should exceed 6,750 per day the telegraph company shall receive an additional payment for said excess at the rate of one-half a cent a word for each circuit over which such excess of matter is sent. That it is also mutually covenanted and agreed that the said National Associated Press shall have the right to require the said telegraph news service to be transmitted and delivered as aforesaid to newspapers or subscribers at any point or place within the territory and located upon the lines owned, operated, leased or controlled by said telegraph company, upon the following conditions, namely : That in case the said news reports shall be transmitted by said telegraph company to any greater number of points or places than the number enumerated in Schedule 'A' hereto annexed, the said telegraph company shall receive over and above the monthly payment hereinbefore provided for an additional payment computed at the rate of one-eighth of a cent per word for all matter transmitted to each place or point in excess of the whole number of points or places enumerated in Schedule 'A,' and it is also mutually covenanted and agreed that in case any of the points or places supplied with the news reports as aforesaid

should, at any time during the continuance of this agreement, cease to take the news service of the said National Associated Press, the telegraph company shall, if some other place be not substituted for the place at which such reports are discontinued, make an allowance or rebate from the said monthly charge of $5,000 at the rate of one-eighth of a cent per word per day for each and every place ceasing to take said news service. Provided, however, that the entire payment of said telegraph company by said National Associated Press under this agreement shall not be less in any one month than at the rate of fifty thousand dollars per annum for the transmission and delivery of the aforesaid news reports to all places or points to which said news reports may be sent under this agreement." The contract further provided that the collection of all moneys due or to accrue from papers or subscribers under the operation of the contract for news transmitted shall be made by the telegraph company for and on the account of the National Associated Press; that a full and detailed account of such collections shall be kept by the telegraph company, which account shall always be open to the inspection of the party of the second part, and that the same shall be furnished and rendered in due form by the telegraph company to the National Associated Press monthly. And payments of the balances, if any, due the National Associated Press by the telegraph company shall be made on or before the fifteenth day of each and every month. The agreement was to continue in force for the period of ten years from the 1st day of February, 1881.

Subsequently and on or about the 3d day of February, 1881, the Atlantic and Pacific Telegraph Company sold, assigned and transferred to the Western Union Telegraph Company, the defendant in this action, all its telegraph lines, appurtenances, business, property rights and privileges, and the defendant undertook and assumed performance of all the valid contracts of the Atlantic and Pacific Telegraph Company, including the contract in question, and on or about the 1st day of March, 1881, proceeded to the performance thereof.

As we have seen, the first defense is that the contract was

illegal and not with the plaintiff. It appears that there formerly existed an association known as The American Associated Press, and that it was engaged in supplying papers with news transmitted over the wires of the Atlantic and Pacific Telegraph Company; that such association ceased to exist, and thereupon the telegraph company commenced the collection and transmission of news to newspapers on its own account, and for the purpose of enabling it to carry on the business, the plaintiff was employed, and a bureau or department for the business was organized and given the name of "The National Associated Press, James H. Goodsell, President." The business was carried on in this manner for several years, and until the contract in question was made. The contract was made with Goodsell, but in the name which had formerly been adopted and under which the business was known to the public, which fact was well known and understood by the officers of the Atlantic and Pacific Telegraph Company. That company consequently was not defrauded or misled by the use of the name adopted by the plaintiff, and neither it nor its assignee can, under these circumstances, be permitted to avoid the contract by reason thereof.

The referee has found as facts that the collections made by the defendant for the plaintiff, under the contract, amounted in the aggregate to the sum of $157,800; that the telegraphic services rendered by the defendant to the plaintiff from the 3d of February, 1881, to the 22d of June, 1882, under the terms and conditions of the contract, amounted to the sum of $78,500, for what is named as the regular service, and the sum of $16,772.58 for additional or extra service in excess of 6,750 words per day, as provided in the fourth clause of the contract, amounting to the sum of $95,272.58, which the defendant was authorized to retain from the collections made; that it had paid to the plaintiff the sum of $45,750, leaving a balance due and owing him of $16,777.42.

As to the amounts collected by the defendant and paid over to the plaintiff there is no dispute. The contention arises upon the amount that should be allowed to the defendant for extra

services rendered under the fourth clause of the contract. As we have seen, the amount so allowed by the referee was $16,772.58. The items composing such amount are not stated by him, but they are stated in the opinion of the General Term as follows:

| | | |
|---|---:|---:|
| Schedule " Z ".............................. | $6, 387 | 48 |
| Schedule " Z 1-2 " ......................... | 4, 863 | 37 |
| Schedule " X " (two items showing special arrangements, Lawrence)................... | 630 | 00 |
| Auburn " Despatch "........................ | 390 | 00 |
| Schedule " X 1-2 " (special arrangement, Auburn) . .............................. | 120 | 00 |
| Schedule " Y," less far western circuit........ | 4, 313 | 28 |
| Schedule " Y 1-2," less far western circuit..... | 68 | 45 |
| Total ................. ................ | $16, 772 | 58 |

Schedule " Z " is for messages received at New York by the plaintiff, marked " collect," from places not on the schedule; and " Z 1-2 " is for miscellaneous bills about which there is no controversy. Schedules " Y " and " Y 1-2 " give the excess of words transmitted over and above the 6,750 provided for in the contract for the eastern, western, far western, southern and state circuits. Under the provisions of the contract the plaintiff was to pay one-half a cent for each word of such excess for each circuit over which the same was sent. The only controversy over these schedules arises out of the including of the fifth or far western circuit, the contention being that there were only four circuits. It appears from the evidence that an arrangement was made with the plaintiff by which two additional operators should be hired at Pittsburg, one for night and the other for day service, to repeat the despatches to the far western towns, and that he was charged therefor in Schedule " Z 1-2," $1,345.55. It is claimed that this arrangement took the place of the far western circuit and that consequently he should not be charged for the excess of words sent over that circuit. The General Term appears to

have adopted that view. The amount for the transmission of the excess over that circuit, as we figure it, amounts to $1,186.21, a sum less than the plaintiff paid for the two repeaters at Pittsburg. It would hardly seem right that the plaintiff should be required to pay the defendant for the regular service and the excess provided for under the contract, and still pay the defendant for its operators, and we are consequently inclined to the view that the employment of the repeaters at Pittsburg was understood to be in lieu of the additional compensation for the far western circuit.

The chief contention arises over Schedules " X" and " X 1-2." They contain a statement showing the number of words transmitted to places not included in Schedule " A" attached to the contract. It is claimed that the defendant under the provisions of the contract is entitled to one-eighth of a cent per word for the number of words transmitted to the places therein named. As to the Lawrence " Eagle," which was supplied with the reports for seven months under a special arrangement of $90.00 per month, making a total of $630.00 ; and the Auburn " Despatch," which was furnished under a special rate of $10.00 per week, making $390.00 and $120.00, there appears to be no controversy. Those items were, therefore, properly allowed. The plaintiff however claims that as to the other places named in these schedules, they were substituted for other places named in Schedule " A," which did not take the reports, and that, therefore, he should not be charged for the transmission of the reports to these places. This involves the construction of the fourth provision of the contract. As we have seen, it provides " that in case the said news reports shall be transmitted by said telegraph company to any greater number of points or places than the number enumerated in Schedule 'A' hereto annexed, the said telegraph company shall receive, over and above the monthly payment hereinbefore provided for, an additional payment computed at the rate of one-eighth of a cent per word for all matter transmitted to each place or point in excess of the whole number of points or places enumerated in Schedule 'A.'" There are thirty-eight places

enumerated in Schedule " A," but all of them did not take the reports.   The right of the plaintiff to substitute other places upon the company's lines within the territory named, for the places enumerated in Schedule "A," not taking the reports, is not questioned, but the plaintiff claims that he has the right to have both the day and night report transmitted to thirty-eight places under the regular service of $5,000 per month.   In other words, that he may have the day report transmitted to thirty-eight different places, and that he may have the night reports also transmitted to thirty-eight places, notwithstanding that they may be different from the places to which the day report is transmitted.   This claim is controverted, and it presents the serious question for our consideration.   It is one in which the minds of the parties may honestly differ, and is not free from difficulty.   The amount claimed under these schedules, deducting the items allowed, is $13,225.60.   Only fifteen or sixteen of the places enumerated in Schedule " A " took the report both day and night.   At no time were there thirty-eight places that received the day report, or thirty-eight that received the night report.   It ran from twenty-five to thirty that received the day report, and from twenty-nine to thirty-seven that received the night report.   Under the contract, but one-third of the daily report could be transmitted in the day-time. The other two-thirds had to be transmitted at night.   Under the construction claimed by the defendant, the plaintiff would have to pay for all places taking the day report only, as much as he would where they took both the day and the night report, although the matter transmitted was but one-third in amount of that which he had the right to have under the contract.   It is not shown that the expenses of such transmission would be increased by a change of the places in which the messages should be dropped, provided the number of drops are not increased, and it is, therefore, not apparent that the defendant will suffer if the construction contended for by the plaintiff is sustained.   By adopting it, he is given the benefit of his contract of having 6,750 words per day transmitted with thirty-eight drops, for the monthly allowance agreed

upon; whilst under the other construction he must necessarily be deprived of the full benefit of his contract, unless he can find thirty-eight places which will take both the day and the night report. But if plaintiff's construction should not be adopted, it would then follow that he would be entitled to a rebate from the monthly charge of $5,000. The contract provides "that in case any of the points or places supplied with the news reports, as aforesaid, should at any time during the continuance of this agreement, cease to take the news service of the said National Associated Press, the telegraph company shall, if some other place be not substituted for the place at which said reports are discontinued, make an allowance or rebate from the said monthly charge of $5,000, at the rate of one-eighth of a cent per word per day for each and every place ceasing to take said news service." It was provided, however, that such rebate should not exceed $10,000 per year, which in this case would amount to about $13,000, and thus equal the excess claimed by the defendant. To avoid this result, it is claimed that there should be taken out of Schedules " X " and " X 1-2 " enough places and added to the places enumerated in Schedule " A," to make the night service up to thirty-eight in number, and that the defendant should be allowed the extra compensation for serving the other places named in the schedules, amounting to the sum of $9,475.10. But we do not understand that the contract requires the plaintiff to do this. Inasmuch as the day service to these places contains but one-third of the number of words, he may prefer to pay the one-eighth of a cent per word for the service, and then have his rebate upon the monthly payments. Whilst the question may be upon the border, we are inclined to the opinion that the contract should receive the construction indicated, and that the amounts claimed under these schedules, except as to the amounts already included, should be disallowed.

The appellant also claims that it should have been allowed the item of $11,934.48 for messages received at New York from the places named in Schedule " A." As we understand, these messages were items of news gathered at places named

and transmitted to New York for publication. An allowance of one-half a cent per word on such messages has already been made in Schedule " Z," which is all that we understand the defendant to be entitled to under the provisions of the contract.

It follows that the findings of the referee as to the amount due and owing to the plaintiff under the contract should be sustained.

The referee has found that the defendant committed a breach of the contract, and awarded the plaintiff thirty thousand dollars as damages therefor. The breaches found were that the plaintiff requested the defendant to deliver telegraphic news reports to various papers within the territory and on the lines described in the contract, and that the defendant failed, neglected and refused to do so; that it also failed to render him an account and pay over the balance on hand on or before the fifteenth day of each month, and that it abandoned the contract and refused to carry out its provisions or transmit the plaintiff's reports. The first conversation to which our attention is called as bearing upon the refusal of the company to continue the performance of the contract, occurred in the month of December, 1881, between the plaintiff and Dr. Green, the president of the defendant. The plaintiff testified that the doctor informed him that a question had arisen in regard to the prices charged for the transmission of the plaintiff's news; that the relations between the Western Union Company and the New York Associated Press had become strained, the press taking the ground that the defendant company was discriminating in plaintiff's favor, giving rates largely below the rates charged the New York Associated Press; that this was an embarrassing position for the telegraph company; that he had taken legal advice upon the subject, and that so far as he could see, the plaintiff's contract was not obligatory upon the company; that it was a *nudum pactum.* Then followed the submission of a proposition for an increased price for the transmission of matter between Washington and New York, and for improved facilities elsewhere, and an extension of territory. The plaintiff replied to the effect that he could

not accept the doctor's views as to the contract; that he desired to carry on his business; that it was increasing and profitable, but that he would be willing to do anything that he could, without waiving the obligations of the contract, to meet their wishes in respect to the making of a supplementary contract, provided he could figure on an extension of territory. Doctor Green then replied that he would give the plaintiff plenty of time; that the company did not desire to act precipitately, but that he wished him to fully consider the subject. The next conversation, as he states, occurred in January, 1882, at which time the plaintiff asked for a schedule of prices paid by other associations, and what they proposed to charge him, in order that he might figure upon those prices and see whether he could afford to consent to pay them, and was informed by Dr. Green that he had received a further letter from the New York Associated Press taking a more peremptory position in regard to the matter, and that the matter of making an amicable arrangement had become more urgent than it seemed to be on the occasion of their first conversation. They again met on or about the first of February, and on that occasion the plaintiff was informed that the executive committee of the Western Union Company had decided to enforce uniform rates upon all press associations, charging all proprietors of press service and all press associations the same scale of prices for the same kind of business, and that the arrangement which he had at first proposed about the modification of the plaintiff's contract in respect to matter between Washington and New York could not be carried out. Thereupon the plaintiff protested and told Dr. Green that he should not consent to any modification of the contract; that he stood upon it and wished it carried out as it was written. Subsequently, and on the eleventh day of March, he received the following letter:

" Western Union Telegraph Company, ·

" Norvin Green, *President*.

" New York, *March* 11*th*, 1882.

" James H. Goodsell, Esq.:

" Dear Sir — When the office of the Atlantic and Pacific Telegraph Company was closed a little more than a year ago,

this company took over a press service for you to certain papers taking your news reports, which we have continued to perform at substantially the same rate it was being done for you by that company. As the rates for this service are absolutely below the cost to this company of performing it, to say nothing of remuneration for the using of its wires, and besides operating a great injustic to other press customers, I was directed some weeks ago by the proper committee of the board of directors of this company to notify you, which I did verbally, that the services cannot be continued unless a very material increase of compensation therefor was paid or secured to this company.

" On the twenty-fifth day of January our executive committee adopted a resolution that the same rates should be charged all patrons for press reports of like character and between the same places. Of this resolution you were informally advised and expressed your readiness to pay the same rate proportionately to the amount of service charged to other associations. You had previously and two months ago at least agreed with me verbally that you would pay the same rate for reports from Washington and drops thereof as was or should be paid by the New York Associated Press. These assurances, however, have not solved the whole question and slow progress has been made towards reaching a distinct understanding of what you shall pay. I am, therefore, directed by the said committee to whom this subject was referred, to say to you that from and after this date you will be charged for the transmission of your press reports the same rate as that charged for other combination press reports in the respective territories in which said reports are handled under existing agreements, and that unless such rate is paid or secured to be paid to this company the services will be discontinued.

" The committee feel that you cannot regard this a short notice since our free discussion of the subject for three months past has given you ample notice that it was our purpose and intention to increase the rates for your reports to that paid us by other customers for like service, and the committee feel

that a decisive step in this direction has been already too long postponed.          Very respectfully yours,

" (Signed.)                    NORVIN GREEN,
                                   " *President.*"

Thereupon the plaintiff saw Dr. Green and informed him of the receipt of the letter and stated that he could not accept the proposition therein contained, that he should pay any substantial increase of price over that named in the contract; that the contract was binding on the company and himself; that he had carried it out and proposed to continue to carry it out in the future if possible. That thereupon Dr. Green replied stating that the contract could not be considered any longer; that he must then inform the plaintiff finally that the contract was repudiated by the company; that they would not perform any more services under the contract, but that if the plaintiff wished to carry on his business under a new contract in accordance with the terms and conditions outlined in the letter they would give him time to see what sort of an arrangement he could make with his customers, and to see whether he could pay the rates which they wished to charge. That thereafter and on the 24th day of March, 1882, the plaintiff received another letter from Dr. Green which contained a proposition for the transmission of his reports upon the new terms therein specified. Thereafter they again met and the plaintiff asked if that was the final action of the company. The doctor replied that it was. That he then told the doctor that he could not consent to accept the terms contained in the letter; that he was prepared to carry out the contract. The doctor replied that he had previously informed him that the contract had been repudiated by the company; that if it ever existed at all it had been abrogated; that he could not discuss with him that contract; that he was prepared to discuss with him the carrying on of the business under a new contract, the terms of which had been outlined in the letter of March twenty-fourth. Other conversations were testified to with other officers of the company of substantially the same import. It appears that

Dr. Green gave the plaintiff time to communicate with his customers to enable him to see what arrangements he could make with them in reference to a continuance of the service. This the plaintiff did, but he was unable to make any arrangement with them under which he could accept the proposition outlined in the letters referred to. Thereupon and on the 20th day of June thereafter he notified the doctor that the papers taking his reports were unwilling to pay the increased price demanded, and he then delivered to the doctor a notice to the effect that he did not waive his claims under the contract; that he was ready and willing to carry it out, and demanded that it should be carried out on the part of the defendant. It further appears that the communication of the plaintiff with his customers asking for increased rates resulted in their calling a meeting in which his difficulties with the defendant were fully disclosed and discussed, and that thereupon his customers organized a corporation under the name of The United Press Association for the purpose of supplying their papers with the news of the day. The plaintiff thus finding himself deprived of his business, on the twenty-fourth day of June stopped the delivery of his reports to the defendant for transmission and thereafter transferred his business to the new company so organized for the sum of three thousand dollars.

It is now claimed that because the plaintiff discontinued his reports on the twenty-fourth day of June that he himself abandoned the contract, and is, therefore, not entitled to damages, but we are not willing to adopt this view. President Green, by his letter of March eleventh, as well as by his subsequent conversations with the plaintiff unqualifiedly repudiated the contract and notified the plaintiff that from that date he should be charged for his reports the increased prices demanded, and at no time afterwards did he recede from this position. He only gave the plaintiff time to communicate with his customers and see whether he could make arrangements for the payment of the rates demanded. When, therefore, he had failed to make new terms with his customers, by

which he could accept the new proposition of President Green, and had notified him of such failure, the extension of time must be deemed at an end, and the position of the parties the same as if such extension had not been given. If the plaintiff on receipt of the letter of March eleventh, in which President Green notified him that the contract was repudiated by the company, and that thereafter he should be charged the increased prices for the matter transmitted, had stopped delivering to the company his reports for transmission, there could be no doubt but that the company would be held to have committed a breach of the contract, and the plaintiff justified in so treating it by stopping his reports. It appears to us that he must be regarded as occupying the same position after the expiration of the time given him to determine whether he could make new arrangements with the papers that had previously taken his reports.

Entertaining these views a discussion of the question arising out of the plaintiff's loss of business in consequence of the conduct of the defendant, as well as other questions upon which the referee has also found the defendant liable for a breach of the contract, does not appear to be necessary.

Questions involving the weight of evidence were properly considered in the General Term. This court can only review the exceptions. Exceptions to findings of fact are well taken if there is no evidence to sustain them. (Code of Civil Procedure, §§ 992, 993 ; *Healy* v. *Clark*, 120 N. Y. 642.)

Many of the facts were found upon a conflict in the evidence. In our review we have only called attention to that portion of the evidence which tends to sustain the findings.

We do not understand that it is claimed that the allowance of thirty thousand dollars as damages for such breach is unreasonable or excessive.

The judgment should be affirmed, with costs to the plaintiff.
All concur.
Judgment affirmed.